OXANA KOZLOV, Cal. Bar No. 209210
649 Dunholme Way
Sunnyvale, CA 94087
Telephone: 650-814-7708
Facsimile: 650-887-2135

Attorney for Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re<br><br>Kimberly Simonee Cromwell<br><br>        Debtor.<br><br>Kimberly Simonee Cromwell<br><br>        Plaintiff,<br><br>vs.<br><br>AMERICA'S SERVICING COMPANY, DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE FOR THE MORGAN STANLEY LOAN TRUST 2006-NC2<br><br>        Defendants | Case No. 09-49655-RN 13<br><br>Chapter 13<br><br>Adversary Proceeding No.<br><br>**DEBTOR'S ADVERSARY COMPLAINT:**<br><br>**(1)    TO INVALIDATE AND DISSALLOW DEFENDANT DEUTSCHE BANK'S CLAIM BECAUSE DEFENDANT DEUTSCHE IS NOT A TRUE HOLDER OF THE NOTE AND NOT A REAL PARTY IN INTEREST; AND**<br>**(2)    BASED ON INEQUITABLE CONDUCT AND TO INVALIDATE THE CLAIM BECAUSE OF SUCH INEQUITABLE CONDUCT.** |

## I.

## JURISDICTION AND VENUE

1. This adversary proceeding complaint (the "Complaint") is brought by Kimberly Simonee Cromwell, Debtor and Plaintiff in the above-captioned bankruptcy case ("Plaintiff") pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure ("FRBP") and Sections 502(b)(1) and 506(d) of the Bankruptcy Code to disallow and invalidate Proof of Claim No. 4 (the "Proof of Claim" or "Claim") filed by Defendant Deutsche Bank National Trust Company in its entirety.

2. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334.

3. This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(B) and 157(b)(2)(K).

4. This District is the proper venue for this proceeding pursuant to 28 U.S.C. § 1409.

## II.

## PARTIES

5. Plaintiff is, and at all relevant times was, resident of the State of California, County of Contra Costa. She is also the legal owner of the property located at 2405 Shelbourne Way, Antioch, Contra Costa County, California 94531, the security interest in which is asserted in the Claim (the "Subject Property"). The Subject Property is her primary and only residence.

6. Defendant DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR THE MORGAN STANLEY LOAN TRUST 2006-NC2 ("DEUTSCHE BANK"), form unknown, is the Trustee for the Morgan Stanley Loan Trust 2006-NC2, which is the purported beneficiary of the Deed of Trust at issue. Plaintiff is further informed and believes, and on that basis alleges, that DEUTSCHE BANK is part of a Pooling and Servicing Agreement dated March 1, 2006, which holds securitized bonds and that Plaintiff's Deed of Trust and promissory note signed by Plaintiff is believed to be one of many in the trust pool. Plaintiff is further informed and believes, and on that basis also alleges that certificates in this trust pool were issued to various individuals on making such individuals holders in due course and the only individuals who have standing to foreclose or collect on the promissory note secured by the Deed of Trust..

7. Defendant AMERICA'S SERVICING COMPANY ("ASC"), a business entity, form unknown, is a division of Wells Fargo Bank and is in the business of servicing loans, with a business address of P.O. Box 10388, Des Moines, IA 50306, and is believed to be a servicer under the loan at issue. Defendant ASC is believed to be an agent of Defendant Deutsche with

-1-

the power of attorney authorizing it to handle the foreclosure of the Subject Property.

### III.
### FACTUAL BACKGROUND

8. Plaintiff obtained a loan to purchase the Subject Property on November 8, 2005 for $509,600.00 from Defendant New Century Mortgage Corporation ("New Century"). Plaintiff executed a Deed of Trust which named New Century as "Lender" and "'beneficiary." Fidelity National Title was named as "Trustee." The Deed of Trust was secured by a Promissory Note in the amount of $509,600.00 dated November 8, 2005 in favor of New Century as "Lender."

9. There was a great deal of confusion regarding the exact terms of Plaintiff's original loan as apparently at the closing she was asked to execute a set of documents with the terms that were inconsistent with the terms that were originally presented to her. As this issue is beyond the scope of this complaint, the exact nature of these inconsistencies will not be elaborated in detail. Suffice it to say, that after the closing of the transaction Plaintiff was left with the impression that the interest on her loan was not going to adjust. She believes that she had been paying interest plus principal (as in a fixed rate loan) for the first two years.

10. On or about November 9, 2007, to her utmost surprise, Plaintiff received a letter from Defendant ASC (who by that time apparently became a servicer under the loan) notifying her of an interest rate increase on her mortgage resulting in increased monthly payments. That's when she first realized that her loan was not a fixed-rate loan. Plaintiff immediately contacted Defendant ASC with an inquiry about possible modification of her loan into a fixed-rate loan. She was informed by an employee of Defendant ASC that her only option would be to apply for a loan modification through the Borrower Counseling Program (which is a hardship-based program). Plaintiff was further informed by that she would not qualify for the modification unless she was three months behind on her payments. Plaintiff was specifically ***advised to miss 3 monthly payments in a row so she would qualify for the loan modification***.

11. Plaintiff would never miss that many payments if she was not specifically advised to do so. She was capable of paying and willing to pay. Her goal was not to further default on her loan obligations but to modify the loan so that it would not adjust every 6 month and she would have confidence of having a traditional fixed rate loan payments. Unbeknownst to Plaintiff, Defendant ASC in fact had no intention of offering a loan modification. Neither had Defendant ASC any authority to enter into a loan modification as Plaintiff's loan was by that time long resold for securitization.

-2-

ADVERSARY COMPLAINT TO DISALLOW
AND INVALIDATE THE CLAIM

12. On or about December 18, 2007, Plaintiff applied in writing to Defendant ASC's Borrower Counseling Program and informed Defendant ASC of the circumstances regarding her delinquency and requested a modification. On January 9, 2008, Defendant ASC requested additional information to proceed with her request for a loan modification.

13. Sometime in early January 2008, Plaintiff was absolutely shocked when she received a Notice of Default and Election to Sell Under Deed of Trust informing her that the Subject Property would be foreclosed upon if she did not pay $14,512.03 to stop the foreclosure. She was informed that she should contact Defendant ASC in care of NDEX for information regarding the disclosure. Along with the copy of the Notice of Default, NDEX sent Plaintiff a letter which indicated that the current creditor to whom the debt was owed is Defendant Deutsche. This was the first time Plaintiff was apprised of the fact that her loan was transferred. Plaintiff started investigating the issue and conducted certain research that convinced her that over the course of the preceding few months she had become a victim of some sort of fraud that in effect was forcing her deeper in default and into foreclosure. However, she was still not aware of the fact that contacting Defendant ASC to resolve the issue was simply a waste of time because the Notice of Default suggested contacting Defendant ASC to reinstate the loan.

14. From January 2008 to April 2008, Plaintiff had numerous discussions with representatives of Defendant ASC and submitted and resubmitted documents regarding her financial situation, in order to become eligible for the loan modification program. Defendant ASC continued to represent to Plaintiff that it was in the process of reviewing her documents for eligibility. At no time did Defendant ASC disclosed to Plaintiff that her Note and mortgage were sold for securitization and ***Defendant ASC in fact had no right to negotiate any loan modification with her, nor had it any interest in doing so as it would stand to benefit from the foreclosure much more than from the loan modification***. An ASC employee instead revealed to Plaintiff that there was confusion within the company in determining the procedure for, and granting eligibility for, the loan modification program. The employee's stated reason for the confusion was that many of the ASC employees were new and unfamiliar with rules and procedures.

15. On April 18, 2008, Plaintiff was further shocked to receive a notice of Trustee's Sale for a sale scheduled May 22, 2008. She promptly phoned Defendant ASC and was informed by an employee that she was eligible for forbearance, and that Defendant ASC would stop the foreclosure proceedings if she agreed to specified terms and conditions.

-3-

16. On April 30, 2008, Plaintiff and Defendant ASC, through an authorized employee, entered into an oral Forbearance Agreement whereby Plaintiff agreed to make four (4) payments to ASC at the increased interest rate of $5707.88 by May 6, 2008, and payments of $4,775.08 each by June 6, July 6, and August 6, 2008. In exchange, ASC agreed (1) to stop the foreclosure proceedings on the sale of the Property, (2) to roll the arrearages from previous months into the loan balance, and (3) that Plaintiff would begin making monthly payments of $3200.00 starting September, 2008. This $3200.00 monthly payment was based on the original interest rate of 7.05%.

17. On May 1, 2008, Plaintiff called ASC and spoke with a supervisor named Meritta. Meritta confirmed the oral agreement Plaintiff entered with ASC the day before. During that discussion, Meritta informed Plaintiff that the May 22, 2008 sale would be postponed until June 23, 2008, and that the sale would continue to be postponed until Plaintiff completed the four (4) payments discussed in the paragraph immediately above. Thereafter, she was told, the interest rate would be reduced to the 7.05%, reducing her monthly payments and would be a fixed rate. By May 3, 2008, Plaintiff had still not received this Agreement in writing, but based on her original understanding of the Agreement, which was made on April 30, 2008, and confirmed on May 1, 2008, Plaintiff made a payment to ASC on May 5, 2008 for $5707.88, thereby partially performing the Agreement.

18. On or about May 10, 2008, Plaintiff received a letter agreement from Defendant ASC purportedly embodying the oral Agreement ASC entered with Plaintiff. This letter agreement, however, indicated terms that *were completely different than that Plaintiff agreed to on April 30, 2008*, in particular it had a four month forbearance period and a balloon payment of $37,588.70; moreover, it did not indicate that the loan would revert to the 7.05% fixed interest rate as specified in the oral Agreement. Needles to say, the terms of the letter agreement provided Plaintiff with little assurance that the situation was in any way resolved.

19. Defendant ASC accepted Plaintiff's payment of $5,707.88, but in breach of the oral forbearance agreement refused to stop the foreclosure proceedings and without Plaintiff's consent scheduled the trustee's sale of the Subject Property for a June 23, 2008. Plaintiff tried and could not receive any specific information about the sale except that the only way to stop the trustee's sale was to perform under the terms of the letter agreement, which provided at best only a very temporary solution, or agree to a short sale.

20. To avoid the imminent loss of the Subject Property and understanding clearly at

-4-

ADVERSARY COMPLAINT TO DISALLOW AND INVALIDATE THE CLAIM

that point that she simply became a victim of fraud, Plaintiff hired an attorney and on June 19, 2008, filed a complaint with the Contra Costa Superior Court (the "Superior Court"). The action is still pending and the trial in this action is currently set for April 19, 2010.

21. On or about June 19, 2008, Superior Court granted Plaintiff's *Ex parte* Application for Temporary Restraining Order. On July 22, 2008, Superior Court issued a Preliminary Injunction conditioned on Plaintiff posting a $10,000 bond and making timely mortgage payments.

22. Ironically, on or around October 8, 2008, Plaintiff very belatedly received the long overdue forbearance and modification agreement that finally made an attempt to memorialize the terms of the oral Forbearance Agreement that was offered to her in May 2008 (with certain monthly payment terms adjustments). She believes she would have agreed to enter into such forbearance and modification agreement, is she had received it timely. The receipt of this forbearance agreement clearly proved all fraud perpetrated against Plaintiff in May-June 2008 by Defendants. It begs no further explanation that by the time Plaintiff belatedly received what she was promised in the beginning of May 2008, she was already deep in litigation and the offer was moot.

23. Plaintiff tried to fully comply with the terms of the Superior Court Preliminary Injunction order by making her regular monthly payments. Defendant ASC, however, for reasons not known or explained to Plaintiff, refused to cash certain selected checks – for November 2008, January and March 2009, in effect creating a pattern of her not complying with her payment obligations (as if she was paying "every other month"). The checks that were not cashed were for some reason placed in the "suspense account". Defendant Deutsche along with Defendant ASC then used this not cashing the checks against Plaintiff and moved to dissolve Preliminary Injunction alleging Plaintiff's failure to pay under the terms of the Preliminary Injunction Order. Defendant Deutsche's and ASC' request to dissolve the injunction was, granted (decision Plaintiff finds hard to accept under the circumstances) and on the very day the order Dissolving the Preliminary Injunction was signed (on September 18, 2009), NDEX (as a purported substituted trustee) issued a second Notice of Trustee's Sale scheduling the sale for October 15, 2009.

24. This bankruptcy petition followed as a last resort attempt to save the Subject Property from foreclosure.

-5-

ADVERSARY COMPLAINT TO DISALLOW AND INVALIDATE THE CLAIM

# IV.
# FIRST CAUSE OF ACTION

# THE CLAIM SHOULD BE INVALIDATED AND DISALLOWED IN ITS ENTIRETY BECAUSE DEFENDANT DEUTSCHE IS NOT A TRUE HOLDER OF THE NOTE AND NOT A REAL PARTY IN INTEREST IN THIS ACTION

25. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

26. A growing number of bankruptcy courts around the country rule that only **a real party in interest (a true holder of the note in this case)** has standing to assert claims and actions arising from the mortgage obligations against debtors in bankruptcy cases. Plaintiff believes that Defendant Deutsche is not a real party in interest with the right to assert a claim in this Court.

27. It is a well established law that a secured promissory note traded on the secondary market remains secured only because and as long as the mortgage follows the note. Cal. Civ. Code § 2936 ("The assignment of a debt secured by mortgage carries with it the security."). As one court has held, "those parties who do not hold the note or mortgage …do not have standing to pursue motions for relief or other actions arising from the mortgage obligation (emphasis added)." *In re Schwartz*, 366 B.R. 265, 270 (Bankr. D. Mass. 2007). In a somewhat different context, another court ruled, "The plaintiff must show that it is the holder of the note and the mortgage at the time the [foreclosure] complaint was filed. The foreclosure plaintiff must also show, at the time the foreclosure action is filed, that the holder of the note and mortgage is harmed, usually by not having the received payments on the note." *In re Foreclosure Cases*, 521 F.Supp.2d, at 653. A recent decision by Hon. Judge Samuel L Bufford in *In re Vargas* provides an excellent short summary of the issue: "Only the holder of a negotiable promissory note… is entitled to enforce the note. See Cal. Com. Code Section 3301. The holder enforces the note by making a demand for payment. See td. at Section 3501(a). The person making a demand shows its right to enforcement by showing the original of the promissory note. See id. Section 3501 (b)(2) (emphasis added)." *In re Vargas*, # LA08-17036SB.

28. Transfer of negotiable instruments such as the Note at issue is governed by Article 3 of the Uniform Commercial Code, which has been adopted in all states including California where it is codified as Unified Commercial Code ("CUCC"). Under the current CUCC regime, enforcement of a note always requires that the person seeking to enforce it show that it is the

current **holder**. A holder is an entity that has acquired the note either as the original payee or through transfer by endorsement of either an order paper or *physical possession of bearer paper*. As discussed below the Note at issue is a bearer paper.

29. Further, Defendant Deutsche must have both constitutional and prudential standing and be the real party in interest under Federal Rules of Civil Procedure ("FRCP") Rule 17, in order to be entitled to pursue an action in this Court[1].

30. Defendant Deutsche so far has provided no shred of evidence to prove that it is a true holder of the Note and mortgage at issue. Attached to the Claim are two documents, both of which are defective.

31. As a preliminary comment, Defendant Deutsche violated procedural requirements by its failure to file supporting documents as required by FRBP Rule 3001(c). In particular, Defendant Deutsche failed to file "the original or a duplicate" of the writing on which security interest might be based. Instead, Defendant Deutsche simply attached copies of the Note and Deed of Trust that were allegedly executed by Plaintiff in connection with the loan transactions. Even though failure to attach writings may not immediately invalidate the claim, under existing law the Claim is no longer entitled to be considered a prima facie evidence of Claim validity. Thus the burden of proof of the Claim validity has now shifted to Defendant Deutsche.

32. The first document that was attached to the Claim is **a copy of the Note** with one *endorsement in blank* which endorsement was apparently applied to the back side of the last

---

[1] Both constitutional and prudential standing are required in such actions as lift-stay relief actions in a bankruptcy court. See an excellent of this issue in the most recent decision by Hon. Linda B. Riegle in *In re Mitchell*, BK-S-07-16226-LBR.

Constitutional standing under Article III requires, at a minimum, that a party must have suffered some actual or threatened injury as a result of the other party's conduct, that the injury be traced to the challenged action, and that it is likely to be redressed by a favorable decision. *Valley Forge Christian Coll. v. Am. United for Separation of Church and State*, 454 U.S. 464, 472 1982)(citations and internal quotations omitted). In order to show its injury by Plaintiff's alleged default under the Note, Defendant should show that it is entitled to receive the payments, not just collect the payments on behalf of another party. Beyond the Article III requirements of injury in fact, causation, and redressibility, a real party in interest must also have prudential standing, which is judicially-created set of principles that places limits on the class of persons who may invoke the courts' powers. See *Warth v. Seldin*, 422 U.S. 490, (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

As a prudential matter, a plaintiff must assert "his own legal interests as the real party in interest," *Dunmore v. United States*, 358 F.3d 1107, 1112 (9th Cir. 2004), as found in FRCP Rule 17 (made applicable in bankruptcy proceedings by FRBP Rule 7017), which requires that ("[a]n action must be prosecuted in the name of the real party in interest."). FRBP Rule 7017 is applicable when a purported creditor files a proof of claim against the bankruptcy estate, which claim becomes subject to an adversary proceeding as in present case. A party asserting a claim and objecting to disallowance of claim is subject to FDBP Rule 7017 since the "action must be prosecuted in the name of the real party in interest". Thus Defendant Deutsche has to be a real party in interest or should be able to prove that it is entitled to prosecute the action in the name of the real party in interest in order to proceed to assert validity of the Claim in this adversary proceeding.

-7-

ADVERSARY COMPLAINT TO DISALLOW AND INVALIDATE THE CLAIM

page of the original (or copy) by New Century. In addition to failure to comply with Rule 3001 requirements, this document does not provide any evidence or confirmation that Defendant Deutsche is the current holder of the Note.

33. Note endorsed in blank, as in the current case, is a bearer paper under the UCC and thus can only be transferred to a true holder **by physical delivery** in order to be valid and enforceable. In other words, only the entity who physically holds the note endorsed in blank can be a note holder for purposes of its enforcement and, as discussed herein, standing.

34. Defendant Deutsche provided no evidence that it currently holds the original of the Note. Only further discovery in this case will show whether Defendant Deutsche is able to produce such evidence.

35. The second document attached to the Claim is a copy of the Deed of Trust along with the defective assignment of the Deed of Trust. According to the assignment, the Deed of Trust was purportedly assigned by Wells Fargo N.A., as Attorney-in-Fact for New Century (original Lender under the Deed of Trust), from New Century Mortgage to Defendant Deutsche on March 26, 2008. In addition to skipping a number of intermediary assignment steps, discussed below, the assignment is defective on its face because by March 26, 2008 New Century had no right to execute any assignments, directly or through a purported attorney-in-fact, as by that time it had had no interest under the Deed of Trust for a number of years.

36. As a part of the securitization process, sometime in 2005, New Century sold the mortgage at issue to NC Capital Corporation, which in turn sold the mortgage to Morgan Stanley Mortgage Capital, Inc. ("MSMC, Inc.") on or around December 1, 2005. On March 1, 2006, Morgan Stanley Capital I, Inc. ("MSCI, Inc."), as Depositor, conveyed the right, title and interest to the subject Deed of Trust and subject Note to Defendant Deutsche[2]. It is unclear how MSCI, Inc. obtained the subject mortgage from MSMI, Inc. Regardless, all these transfers occurred well before March 26, 2008, when the purported assignment of the Deed of Trust was executed on behalf of New Century. Thus the assignment submitted with the Claim and recorded against the Subject Property is defective on its face and is a legal nullity. In addition, as discussed below, it

---

[2] Defendant Deutsche, as Trustee of the Morgan Stanley Loan Trust 2006-NC2 entered into a Pooling and Servicing Agreement ("PSA") dated March 1, 2006 with the following parties: Morgan Stanley Capital I, Inc. ("MSCI, Inc."), as "Depositor;" Wells Fargo Bank, N.A. as "Servicer" and NC Capital Corporation as "Responsible Party." The PSA was attached as Exhibit 4 to the Form 8-K Amendment to Current Report filed by Morgan Stanley Capital I Inc./Trust 2006-NC2 on or around March 30, 2006 with the Securities and Exchange Commission and can be obtained from this website
http://www.sec.gov/Archives/edgar/data/1354446/000091412106001553/ms898247-ex4.txt

Case: 09-04511    Doc# 1    Filed: 11/09/09    Entered: 11/09/09 13:22:59    Page 9 of 14

is a prime facie evidence of Defendants' violation of California recording and foreclosure laws.

37. The conclusion follows, that unless Defendant Deutsche can show that it holds the original of the Note and the Deed of Trust with all proper assignments and makes such Note, Deed of Trust and assignments available to the Court's and Plaintiffs' inspection, Defendant Deutsche is not a real party entitled to submit a proof of claim in these bankruptcy proceedings.

38. Thus, the Claim should be disallowed under FDBP 7001 and invalidated in its entirety under Bankruptcy Rule 502(b)(1) since "such claim is unenforceable against the debtor[s] and property of the debtor[s], under any agreement or applicable law for a reason other than because such claim is contingent or unmatured" because no enforceable contract exist at present between Plaintiff and Defendant Deutsche.

## V.

## SECOND CAUSE OF ACTION AGAINST BOTH DEFENDANTS BASED ON DEFENDNATS' INEQUITABLE CONDUCT DURING LOAN SERVICING AND WRONGFUL FORECLOSURE PROCEEDINDS: AND TO INVALIDATE THE CLAIM BECAUSE OF SUCH INEQUITABLE CONDUCT

39. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

40. Defendant Deutsche through its agent and loan servicer Defendant ASC made numerous misrepresentation and engaged in numerous acts of inequitable behavior when they intentionally (or in the alternative grossly negligently) forced Plaintiff in default, foreclosure and eventually precipitated this bankruptcy.

41. Except for just a few months, during all the time at issue Plaintiff was gainfully employed, was willing and capable to pay for the Subject Property under the terms of any reasonable (i.e. 7.05%) fixed-interest loan (or even under her current mortgage terms for that matter) and diligently tried to do everything possible to save her only residence. She would never default under her obligations to the point of giving Defendants a right to initiate foreclosure proceedings if she was not specifically advised to fall behind on her payment obligations, purportedly to qualify for a loan modification.

42. She approached Defendant ASC with her request to start a loan modification process almost two years ago, in November 2007, and formally applied for a loan modification through Defendant ASC's Borrower Counseling Program in December 2007. At that time she was just slightly more 90 days delinquent, and even that "default" was caused exclusively by

-9-

ADVERSARY COMPLAINT TO DISALLOW AND INVALIDATE THE CLAIM

Defendant ASC. Regardless, the situation could have been easily cured. Instead of considering her loan modification application, Defendant ASC, however, intentionally forced Plaintiff further in default and illegally initiated foreclosure proceedings, all in violation of all relevant California non-judicial foreclosure law.

43. Defendant ASC misrepresented its authority to modify Plaintiff's loan as it had no such authority under the terms of the Pooling and Servicing Agreement ("PSA") with Defendant Deutsche[3]. Plaintiff justifiably relied on such misrepresentations.

44. On January 9, 2008, Defendant ASC still pretended to work on Plaintiff's loan modification when it requested additional information to purportedly proceed with Plaintiff's request. At the same time the purported substituted trustee informed Plaintiff that the Notice of Default was already recorded against the Subject Property. The possibility of foreclosure was not even mentioned to Plaintiff by Defendant ASC prior to that.

45. Based on the information that is available in press and internet, Plaintiff now believes, that she was forced into the foreclosure because Defendant ASC would stand to benefit more from the foreclosure than from any loan modification, even if it was granted authority to do such modification[4].

---

[3] Pursuant to Article II, Section 3.01(c) of the PSA Defendant ASC is prohibited to modify the loans to change, among other things the interest rate.

[4] See, for instance "Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior: Servicer Compensation and its Consequences" Written by *Diane E. Thompson,* Of Counsel, National Consumer Law Center, © 2009 National Consumer Law Center®:

"Servicers have four main sources of income, listed in descending order of importance:
- The monthly servicing fee, a fixed percentage of the unpaid principal balance of the loans in the pool;
- Fees charged borrowers in default, including late fees and "process management fees";
- Float income, or interest income from the time between when the servicer collects the payment from the borrower and when it turns the payment over to the mortgage owner; and
- Income from investment interests in the pool of mortgage loans that the servicer is servicing.

Overall, these sources of income give servicers little incentive to offer sustainable loan modifications, and some incentive to push loans into foreclosure. The monthly fee that the servicer receives based on a percentage of the outstanding principal of the loans in the pool provides some incentive to servicers to keep loans in the pool rather than foreclosing on them, but also provides a significant disincentive to offer principal reductions or other loan modifications that are sustainable on the long term. In fact, this fee gives servicers an incentive to increase the loan principal by adding delinquent amounts and junk fees. Then the servicer receives a higher monthly fee for a while, until the loan finally fails. Fees that servicers charge borrowers in default reward servicers for getting and keeping a borrower in default. As they grow, these fees make a modification less and less feasible.

The servicer may have to waive them to make a loan modification feasible but is almost always assured of collecting them if a foreclosure goes through."

46.     Defendant ASC, acting within the scope of its agency relationship with Defendant Deutsche, further defrauded Plaintiff when in May of 2008 it purportedly agreed to offer her a forbearance and modification agreement and stop the foreclosure.  As discussed above, the written terms that she received shortly thereafter had no semblance to the agreed-upon terms of the oral agreement.  Defendant ASC simply collected certain payments from Plaintiff and promptly proceeded with the trustee sale.  It was by pure accident (apparently caused by an internal mistake on Defendants' part), that she got a confirmation of the terms of the oral agreement much later, in October 2008, by which time she was already in litigation to protect the Subject Property against foreclosure.  Plaintiff believes that she would have agreed to the terms of the proposed modification if she had received it timely.

47.     Defendants' misdeeds and inequitable conduct have not stopped at that, however.  When Plaintiff tried to fully comply with the terms with the Superior Court Preliminary Injunction Order to protect the Subject Property against foreclosure, Defendant ASC simply stopped cashing her checks and suspended her account to prepare the stage for a motion to dissolve Preliminary Injunction and immediately recorded the second notice of sale when the motion was granted.  Needless to say that no attempts to comply with the requirements of Cal. Civ. Code Section 2923.5 were made at that point.

48.     Defendants engaged in inequitable conduct when they wrongfully initiated or directed other parties to initiate foreclosure proceedings against the Subject Property without disclosing the name(s) of the true beneficiaries under the Note and thus further precluding Plaintiffs from an opportunity to stop the foreclosure.

49.     California Civil Code § 2932.5 govern the power of sale under an assigned mortgage, and provides that the power of sale can only vest in a person entitled to money payments and only if the proper assignment is duly acknowledged and recorded:

> Where a power to sell real property is given to a mortgagee, or other encumbrancer, in an instrument intended to secure the payment of money, the power is part of the security and vests in any person *who by assignment becomes entitled to payment of the money secured by the instrument.  **The power of sale may be exercised by the assignee if the assignment is duly acknowledged and recorded***.

(emphasis added).  See Cal. Civ. Code § 2932.5.

50.     In the case at hand the Note was long assigned to Defendant Deutsche prior to the initiation of the foreclosure proceedings at issue in January of 2008, moreover, assigned through multiple levels of intermediary beneficiaries.  The defective assignment was recorded only in or

-11-

ADVERSARY COMPLAINT TO DISALLOW AND INVALIDATE THE CLAIM

around April 8, 2008. Thus the Notice of Default is defective on its face. Furthermore, Defendant Deutsche had no right to initiate the foreclosure without duly acknowledged and recorded assignment under California law. Plaintiff has good reasons to believe that no such assignments exist and will engage in the discovery to confirm this as a part of this adversary proceeding.

51. Defendants in effect have engaged and continue to engage in outrageous abuse of the system, using all possible loopholes to avoid compliance with California laws. The case at hand is the case when the only "fault" on the Plaintiff's part was her attempt to replace an adjustable-rate loan by a traditional fixed-rate loan. She paid a dear price for that as she was pushed into default, into foreclosure and eventually into litigation and bankruptcy, all to satisfy Defendants' insatiable desire to maximize their profits.

52. Plaintiff alleges that the above-discussed inequitable conduct of Defendants has caused Plaintiff to incur costs and expenses in addition to the prospect of losing the Subject Property to a trustee's sale. It is this inequitable conduct, and not Plaintiff's financial conditions, that in effect precipitated this bankruptcy. By now Plaintiff's credit is irreparably damaged and she has no hope to obtain any reasonable loan modification any more. The Subject Property value meanwhile plummeted leaving her with no chance to refinance the Subject Property.

It appears to be abundantly clear that Defendant followed a repeated and consistent pattern of inequitable conduct which continued through Plaintiff's failed attempts to negotiate a loan modification and unlawful foreclosure, and this Court should have sufficient grounds to invalidate the Claim, in full or partially as this Court find to be proper under the circumstances.

Dated: November 9, 2009    /s/ Oxana Kozlov, Esq.
_____
Oxana Kozlov, Esq.
Attorney for the Debtor Kimberly Simonee Cromwell

-12-

ADVERSARY COMPLAINT TO DISALLOW AND INVALIDATE THE CLAIM

# VERIFICATION

I, Kimberly Simonee Cromwell, declare as follows:

1. I am a Plaintiff in the above-entitled adversary proceedings and have read the foregoing Complaint, and know its contents.
2. The facts stated in it are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this verification was executed this 8th day of November, 2009, in Antioch, California.

/s/ Kimberly Simonee Cromwell
_____

Kimberly Simonee Cromwell

-13-